# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>JASON BRADLEY,<br><br>*Defendant.* | CASE NO. 3:16-cr-50008<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Before the Court is Defendant's Motion for Revocation of Detention Order. Dkt. 895. Defendant seeks revocation, pursuant to 18 U.S.C. § 3145(b), of Judge Hoppe's detention order entered on May 19, 2020. Dkt. 872. Through counsel, Bradley asks to be released, pending his trial, on any conditions this Court deems appropriate. In support of his position, Defendant submits three independent bases, each of which, he contends, constitutes a "compelling reason" under 18 U.S.C. § 3142(i). The compelling reasons he outlines are as follows: (1) Bradley's well-documented underlying medical conditions coupled with the COVID-19 pandemic and the explosion of the virus throughout the Bureau of Prisons—including FCI Fort Dix where Bradley is currently housed—make him susceptible to increased risk of harm from COVID-19; (2) Bradley's pretrial release is necessary for the effective preparation of his defense; and (3) Bradley's continued pretrial detention in excess of 10 months with a trial date indefinitely rescheduled violates his Fifth Amendment right to Due Process.

The Court finds that detention is proper and, because Defendant fails to show compelling reasons for temporary release, the Court will deny Defendant's motion for revocation of the detention order.

1

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Defendant Jason Bradley was charged through a superseding indictment along with six others for their alleged roles in a complex conspiracy to distribute synthetic drugs—3,4-methylenedioxyprovalerone ("MDPV") and a-Pyrrolidinovalerophenone ("a-PVP")—more commonly known as "bath salts." Dkt. 23. Specifically, Bradley was charged with four counts in the superseding indictment: (1) conspiracy to distribute and to possess with the intent to distribute one or more controlled substances, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C); (2) conspiracy to import a controlled substance, 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(3); (3) conspiracy to commit "promotion money laundering," 18 U.S.C. § 1956; and (4) conspiracy to commit international money laundering, 18 U.S.C. § 1956. *Id.* Bradley pled not guilty to the charges, choosing to go to trial.

At trial, Bradley was convicted by a jury on all counts. The Fourth Circuit vacated the convictions, finding that this Court committed reversible error when it failed to submit to the jury any question of whether the Government established that Bradley and his alleged co-conspirators committed the offenses in the Western District of Virginia. *United States v. Taylor*, 784 F. App'x 145, 153 (4th Cir. 2019). Reviewing the evidence presented at trial, the Fourth Circuit held that "although there may have been sufficient evidence for jury findings of proper venue, there was not substantial and uncontroverted evidence such that the venue issues could be withheld from the jury. Thus, we are constrained to recognize that the district court's error in failing to submit the venue issues to the jury was not harmless." *Id.* at 154.

After the Fourth Circuit's decision, Bradley filed a motion to dismiss. Dkts. 832, 859. In that motion, Bradley argued dismissal on two grounds: (1) because he was tried on the indictment previously, retrial would violate the Double Jeopardy Clause, and (2) insufficient evidence to

prove venue is proper. Dkt. 832. He further contended that the Fourth Circuit implicitly concluded that evidence as to venue was insufficient as a matter of law. Dkt. 863. This Court denied both arguments, as the Fourth Circuit's reasoning included no such conclusion as to the sufficiency of the evidence. Dkt. 875. Bradley, by interlocutory appeal, sought review by the Fourth Circuit of this Court's denial of his motion to dismiss on Double Jeopardy grounds. Dkt. 885. The Fourth Circuit has yet to rule on the issue. Pending resolution of this interlocutory appeal, this Court stayed the matter until the appeal is resolved. Dkt. 887. Pursuant to 18 U.S.C. § 3161(h)(1)(C), any "delay resulting from any interlocutory appeal" "shall be excluded . . . in computing the time within which the trial of any such offense must commence." This Court found "the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).

     The Court has delayed trial for Bradley on numerous occasions. The Fourth Circuit's mandate following their vacating of Bradley's conviction occurred on September 10, 2019. Dkt. 899 at 21. It was continued fifty-five days later on November 4, 2019 until February 28, 2020. Dkt. 840. The reason for this continuance was two-fold. With retrial scheduled for November 19, 2019, the Government requested the Court "to extend the period for retrial to one hundred and eighty days from the date the action occasioning the retrial became final, or to a date otherwise convenient for the Court," pursuant to the Speedy Trial Act. Dkt. 825. The rationale for the request was due to the complexity of the trial, which included dozens of witnesses, some located overseas, and hundreds of exhibits. *Id.* Defendant did not object to the continuance, but the Court noted that, because Bradley's counsel sought to withdraw from the matter, any new counsel to the case would almost certainly need additional time for adequate trial preparation. Dkt. 840. The Court relied on the Speedy Trial Act's language that "[if] the defendant is to be tried again following an appeal . . . the court retrying the case may extend the period for retrial not to exceed one hundred and

eighty days from the date the action occasioning the retrial becomes final if unavailability of witnesses or other factors resulting from passage of time shall make trial within seventy days impractical." *Id.*

A second continuance was granted on January 22, 2020 until August 5, 2020. Dkt. 856. The motion was filed by Bradley's co-Defendant, who sought a continuance because her counsel (and, as it turns out, Government counsel) had a scheduling conflict. *Id.* In the alternative to a continuance, the co-Defendant requested severance from Bradley's trial. *Id.* The Government did not oppose a continuance, and Bradley did not state a position on the record. *Id.* This Court relied on the Speedy Trial Act's language that a court can consider "[w]hether the failure to grant a continuance . . . would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h)(7)(B)(iv). Because failing to continue this case would deny the time necessary for effective preparation and the parties' likely need to secure appearance of dozens of witnesses from disparate geographical locations, this Court granted the continuance. Dkt. 856.

The final continuance was granted on June 25, 2020 for an indefinite period, pending the interlocutory appeal filed by Bradley. Dkt. 887. This motion was considered *sua sponte* by the Court. *Id.* Given the difficulties presented by domestic and international travel restrictions due to the COVID-19 pandemic, as well as Bradley's interlocutory appeal, the Court found that a continuance was necessary, with the time being excluded from any calculation of the Speedy Trial Act.

Bradley now asks the Court to revoke the detention order signed by Magistrate Judge Hoppe. Dkt. 895. Both parties have submitted briefs and responses, making the issue ripe for review.

## II. LEGAL STANDARD

A trial court reviews a magistrate judge's decision on detention *de novo*, and may revoke an order of pretrial release under 18 U.S.C. §3145. *See United States v. Putillion*, No. 2:18-cr-00186, 2018 WL 5784066, *2 (S.D.W. Va. Nov. 5, 2018) (citing *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990)); *United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989). A defendant must be detained pending trial if, after a hearing, the court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

To begin, "resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act, 18 U.S.C. § 3142(g): the nature and circumstances of the offense charged, including whether it involves controlled substances or firearms; the weight of the evidence against the defendant; the defendant's history and characteristics (including history relating to drug abuse . . . )." *United States v. Martin*, 447 F.Supp.3d 399, 402 (D. Md. 2020). Should the Court determine that the defendant is a flight risk or danger to the community, based on the § 3142(g) factors, the Court may then detain a defendant without bail.

Notwithstanding a finding that a defendant is a flight risk or danger to the community, 18 U.S.C. § 3142(i) states that the "judicial officer may, by subsequent order, permit the temporary release of the person . . . to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason."

## III. DISCUSSION

**A.** *Fifth Amendment Due Process Violation*

5

"The length of a defendant's pretrial detention might not survive a proper due process challenge." *United States v. Colombo*, 777 F.2d 96, 101 (2nd Cir. 1985) (footnote omitted); *see United States v. Portes*, 786 F.2d 758, 768 (7th Cir. 1986) ("We recognize that, at some point, the length of delay may raise due process objections and we urge that district courts expedite the trials of those detained pending trial."); *United States v. Accetturo*, 783 F. 2d 382, 388 (3rd Cir. 1986) ("We agree with the Second Circuit that at some point due process may require release from pretrial detention or, at minimum, a fresh proceeding at which more is required of the government than is mandated by section 3142.").

Typically, the Speedy Trial Act requires that a trial commence within seventy days of the filing date. 18 U.S.C. § 1361(c)(1). However, pursuant to statutory provisions, a district court may extend the period for retrial up to 180 days from the date the action occasioning the retrial becomes final "if unavailability of witnesses or other factors resulting from passage of time shall make trial within seventy days impractical." 18 U.S.C. § 3161(e). Subsection (h) of the Speedy Trial Act outlines a number of instances where the computation of time shall be excluded. These include delays resulting from an interlocutory appeal or through a finding that the ends of justice are served by continuing the case. *See* 18 U.S.C. § 3161(h). For the purposes of considering excessive pretrial detention, the Court should consider "the extent to which the government bears a significant responsibility for the duration of that detention." *United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986). The Court should also take into account that a defendant whose trial has been stayed by his interlocutory appeal "normally should not be able . . . to reap the reward of dismissal for failure to receive a speedy trial." *Vermont v. Brillon*, 556 U.S. 81, 90–91 (2009) (quoting *United States v. Loud Hawk*, 474 U.S. 514, 521 (1972)).

To determine whether the length of pretrial detention has become unconstitutional, a court must weigh (1) the length of pretrial detention against (2) the extent of the prosecution's

6

responsibility for the delay of the trial, (3) the gravity of the charges, and (4) the strength of the evidence upon which detention was based, i.e., the evidence of risk of flight or dangerousness. *See United States v. El-Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994).

Defendant argues that his Due Process rights were violated because (1) the government's proffer of unreliable hearsay, and the Magistrate's reliance on the proffer, violated his procedural Due Process rights, and (2) Bradley's extended pretrial detention has become punitive and violates Due Process. Dkt. 900 at 17.

    1. Proffered Evidence

First, Bradley argues that the government's evidence alleging that he was a flight risk was based on hearsay. Dkt. 895 at 15. Bradley requested that the Government make its witnesses available for cross-examination during the bond hearing, but the Court did not rule on the motion and the Government proceeded through proffer. Defendant alleges that the Magistrate relied on proffers to reach an "erroneous conclusion," which contradicts the record, that Bradley "has access to a large amount of cash and has failed to disclose his assets." Dkt. 850. Although § 3142 permits the admission of evidence through proffer, the evidence must be reliable. *United States v. Thomas*, 2006 WL 140558, at *9 (D. Md. Jan. 13, 2006) ("However, the Court must nevertheless ensure that the evidence upon which it relies is reliable.").

The Government presented evidence to the Magistrate Judge which included the following: a photo of a fake ID, an affidavit of a case agent, a copy of a pleading by Katrina Strub against Jeffrey Smith, a motion for leave to withdraw, Dkt. 432, and Defendant's supplemental sentencing memorandum. Bradley argues that any evidence put forth by the Government that was proffered by Jeffrey Smith is uncorroborated hearsay. He further states that he had no opportunity to cross-examine the Government's witness. However, the record tells a different story. At the hearing in front of Magistrate Judge Hoppe on December 12, 2019, the Government put forth the

7

fake ID as evidence. They stated that the ID was provided to law enforcement by Mr. Smith "during an interview that took place recently." Dkt. 898 at 25. Defendant was given the opportunity to cross-examine the case agent, and he gave no objection to admission of the fake ID as Government's exhibit 1. *Id.* at 26. The case agent, Agent Pierson, testified that he had conversations with Mr. Smith about Bradley in the presence of his counsel in the weeks prior to the proceeding. *Id.* at 49. His co-agent, who did not testify, told Agent Pierson about that he had received a copy of the fake ID with Bradley's name on it. *Id.*

Defendant asks the Court to discredit all the evidence which may have emanated from Mr. Smith because of a toxic and complex history between Smith and Bradley's family, as well as ongoing litigation between Smith and Bradley's mother. Dkt. 895 at 17. In that ongoing litigation, Mr. Smith filed a motion in which Defendant claims Smith contradicts statements he made to the case agent who testified at the December 12, 2019 hearing. Defendant says that Mr. Smith contradicts himself in the new pleading because Smith initially claimed he did not see or take possession of any money and that he purchased the vehicle at issue and has title to it. *Id.* at 19.

Defendant is correct in stating there are inconsistencies in the most recent pleading and what Mr. Smith told law enforcement. During the December 2019 hearing, the Government stated that [Mr. Smith] was "given the keys to Bradley's Mercedes" even though he was eventually instructed to put the car in his own name. Dkt. 898 at 22–23. This is counter to what Smith plead in the federal case against Bradley's mother. Dkt. 895-11 at 3. In the same pleading, Smith asserts that there is no evidence that shows Mr. Smith agreed to transport money, or that the money ever existed. Dkt. 895-11 at 3. Again, this runs counter to what he told case officers about transporting cash. Dkt. 898 at 22–23. Therefore, Defendant claims, no evidence proffered by Smith can be considered reliable, and the Government lacks evidence demonstrating that Bradley is a flight risk.

8

The Government's brief does not address the hearsay issue head on, and neglects to take into account the details surrounding the unreliability of Smith's statements, on which the Government's proffers rely. The Court is persuaded by the Defendant that the specific evidence pointed to is not necessarily reliable. However, this alone does not end the inquiry.

2. Excessive Pretrial Detention

Defendant makes a second due process argument that his pretrial detention has become punitive in nature. Bradley blames the Government's lack of preparedness for his extended stint in prison. Dkt. 895 at 14.

3. Factors Regarding Unconstitutional Detainment

There is no question that Defendant has been in pretrial detention for nearly a year. Dkt. 895 at 1. As far as the second *El-Gabrowny* factor, the extent of the prosecution's responsibility for the delay of the trial, the prosecution does not bear the brunt of the responsibility for the significant delays in trial. Indeed, the current stay is due solely to Defendant's interlocutory appeal. An earlier continuance was due, in part, to the logistical challenges surrounding travel during the COVID-19 pandemic. Moreover, the initial continuance following Bradley's successful appeal was well within the allowance prescribed under the Speedy Trial Act.

With respect to the third factor, the gravity of the charges, the charges levied against Bradley are significant, requiring a rebuttable presumption that Bradley be detained under the Bail Reform Act. *See* 18 U.S.C. § 3142(e)(3)(A). Insofar as it relates to the strength of the evidence upon which detention was based, Defendant puts forth a legitimate argument that the evidence proffered by the Government in reliance on Mr. Smith was in fact unreliable.

Factor number four requires the Court to consider the strength of the evidence upon which detention was based, i.e., the evidence of risk of flight or dangerousness. With pretrial detention, the burden rests on the Government to show, by a preponderance of the evidence, that no condition

9

or combination of conditions will reasonably assure the person's presence as required or, alternatively, by clear and convincing evidence that no such condition(s) will reasonably assure the safety of any other person and the community if the defendant is released. *See* 18 U.S.C. § 3142.

Bradley supports the contention that he is not a flight risk by pointing to the fact that he has a clear record while out on bond during pretrial supervision and throughout his trial. Dkt. 799 at 3. He also points to the fact that he has turned in his passport. *Id.* at 4.

However, this Court previously found that Bradley should be detained [1] because "significant evidence presented at trial established Defendant Bradley's connections with China, a country that the United States does not have an extradition treaty with." Dkt. 612. It has also relied on the Government's evidence of substantial contacts in Asia and a potential lengthy sentence of imprisonment to justify detainment. For example, at the hearing on April 20, 2018 considering Bradley's prior motion for bond, the Government put forth evidence gathered from a reliable source, Co-Defendant Ryba, who disclosed that Bradley had sold a house and some property owned in Thailand for approximately $440,000. Dkt. 799 at 9. Ryba also disclosed that approximately $30,000 of the payments were actually made using prepaid credit cards and involved the Defendant's mother. *Id.* These financials were not disclosed during Defendant's initial appearance when the financial affidavits were executed. *Id.* at 10. Ryba also observed what she believed to be machines for making identification documents. *Id.* Therefore, under the *El-Gabrowny* factors, Bradley's detainment is not unconstitutionally excessive in violation of the Due Process Clause.

---

[1] The Court considered the evidence under 18 U.S.C. § 3143, not § 3142.

Moreover, although some of the evidence relied upon by the Magistrate Judge may be deemed unreliable hearsay, the Court could ignore the Government's proffers of evidence from Mr. Smith and still find that there is a preponderance of evidence which demonstrates that Bradley poses a risk of absconding. Given the evidence presented previously, it is well within the Court's discretion to make its own independent determination that Bradley should be held in pretrial detention because he is a flight risk. 18 U.S.C. § 3142(g). Defendant's contacts in Asia, history of dishonesty regarding his overseas finances, and evidence suggesting he has the ability to make fake identification documents all lean in favor of detainment. Further, his offense is a serious one and the weight of the evidence against the defendant is substantial. Taken all together, the Court finds that Bradley's detention is constitutional.

## B. *COVID-19 Pandemic*

In the context of the Bail Reform Act and COVID-19, the Fourth Circuit has instructed district courts to consider "the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i)."[2] *United States v. Creek*, No. CCB-19-036, ECF 402, 2020 U.S. App. LEXIS 11971 (April 15, 2020); *see United States v. Scarborough*, --- Fed.Appx. ---, 2020 WL 4558271, at *2 (6th Cir. Aug. 5, 2020) (adopting a similar multi-factored test, requiring district courts to evaluate: (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate

---

[2] Courts should treat motions seeking relief under § 3142 as different than those of compassionate release under § 3582(c)(1)(A) because that § 3142 analysis does not require consideration of the § 3553(a) sentencing factors.

11

other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risk to others); *United States v. Clark*, 448 F. Supp. 3d 1152, 1157 (D. Kan. 2020).

Defendant argues that the factors outlined in *Creek* weigh in favor of temporary release. Dkt. 900 at 4–12. First, Bradley urges the Court to consider his specific vulnerabilities as to COVID-19. Bradley's medical records show that he is obese, with a BMI above 30 in the 35–35.9 range. *See* Exhibit #1. In addition, his briefs assert that he has an undiagnosed history of hypertension. The CDC lists obesity as a condition which places individuals of any age at an increased risk of severe illness from the virus that causes COVID-19.[3] It lists hypertension or high blood pressure as potentially increasing the risk for severe illness. *Id.* ("[M]ight be at an increased risk."). It is uncontroverted that being obese places an individual at serious risk of COVID-19 complications. Bradley contends that the combination of obesity and undiagnosed hypertension makes his situation even more perilous.

Moreover, Bradley's initial brief and his reply argue that the Bureau of Prison's efforts to stop the spread of COVID-19 in prisons has been "wholly ineffective." Dkt. 895 at 23. He relies on the data showing that social distancing is impracticable at most facilities, but certainly so at FCI Fort Dix. *Id.* A number of cases have sound that Fort Dix does not permit social distancing. *See id.* at 24 (collecting cases). Defendant provides a number of declarations from inmates at Fort Dix alleging that COVID-19 protocols are being ignored or cast aside. *See id.* at 26–27.

Additionally, Bradley provides three supplemental briefs, each informing the Court of updated information regarding COVID-19's impact on FCI Fort Dix. *See* Dkt. 901, 903, 904. On

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html

12

October 15, 2020, the Warden of the prison notified inmates that there would be an indefinite hold on all visitation "[d]ue to a recent increase in the number of positive COVID-19 cases both in the community and the institution . . . ." *Id.* at 1; *see* https://www.bop.gov/locations/institutions/ftd/ ("All visiting at this facility has been suspended until further notice."). As of Defendant's supplemental filing on October 21, 2020, the BOP reported 14 active inmate cases and 6 active staff cases of COVID-19. Dkt. 901. Since then, this number has increased dramatically to 229 as of November 6, 2020. Dkt. 906. Bradley posits that the circumstances at the prison are worse than reported because "the BOP is not testing any inmates who do not self-report symptoms and/or are known to have come in close contact with an infected individual." Dkt. 907 at 3. He urges us to treat the reported numbers as a floor and not a ceiling. *Id.*

The Government argues that Bradley fails to present compelling circumstances as a result of existing health conditions. Dkt. 899 at 9–20; Dkt. 906. First, the prosecution notes that Bradley's proposal is not one for temporary release. This is because there is no trial date set, as the matter has been continued indefinitely pending the Fourth Circuit's determination as to Bradley's interlocutory appeal. Because § 3142(i) contemplates only temporary release, the Government says, Bradley cannot seek release since it would be indefinite in nature.

Next, the Government focuses on the fact that the BOP has taken a number of precautions to protect prison inmates and staff from contracting COVID-19. Indeed, the prosecution outlines all the different action plans, phases, and directives which have been announced since the pandemic began. *See* Dkt. 899 at 11–12. Turning their focus to Fort Dix, the Government asks the court to be aware that Fort Dix consists of two separate facilities which are divided into an East compound and a West compound. Dkt. 906 at 3. The compounds are separated by drivable roads and razor-wire fencing. Dkt. 906-1. Further, each housing unit to which an inmate is assigned is a

13

separate, stand-alone building. *Id.* Both compounds have quarantine housing units that are separate from the housing units reserved for the general population. *Id.*

The housing units at the prison are separate, stand-alone buildings. *Id.* They are locked, and inmates cannot enter housing units outside of the one to which they are assigned—effectively creating a micro-population separated from others. *Id.* Of course, some prison staff do work in various housing units. Dkt. 907 at 11. Bradley is assigned to the East compound in housing unit 5752. Dkt. 906 at 3. This housing unit has no positive COVID-19 cases, and the patient which Bradley refers to in his reply brief was not housed in his housing unit nor in the general population for the East compound. Dkt. 906-1; *see also* Dkt. 900-1. Instead, the COVID-19 outbreak at the facility occurred in the West compound, in housing unit 5812. Dkt. 906 at 3.

The most up-to-date data validate the Government's arguments. Of the 229 cases at Fort Dix, 217 are in housing unit 5812 in the West compound. *Id.* This is also where inmates who have tested positive are quarantined. *Id.* The additional twelve cases fall between seven inmates who are isolated in a special housing unit and five inmates who tested positive upon transferring to Fort Dix and remain in quarantine. *Id.* Together, these facts present a picture which goes against that painted by Bradley. In fact, even with an outbreak in the 5812-housing unit, it appears as though Fort Dix has limited the possibility of COVID-19 spreading to any other part of the facility. It is not enough that there is an ongoing outbreak at the facility; Bradley must show a heightened risk of exposure to someone diagnosed with COVID-19. *See United States v. Sanmiguel*, 2020 WL 3036636 (N.D. Tex. Jun. 5, 2020) (denying motion for release even in face of underlying medical condition where defendant "does not allege that she is being detained in the same part of the facility where anyone who is asymptomatic or has been diagnosed with COVID-19 is being detained"). Here, not one person in the confined housing unit has tested positive, and all other outstanding cases are being contained outside the East compound.

14

Moreover, the Government argues that Bradley's risk of contracting the virus remains "purely speculative." *Id.* at 14. Because "a Defendant should not be entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and speculation," the Government suggests that the Court may not provide the requested relief because Defendant has not met his burden to demonstrate such unique conditions. *Clark*, 448 F. Supp. 3d at 1156. Bradley argues that the volatility of the situation, and the potential for a rapid spread through a housing unit, make the harm real and not speculative. However, there is no evidence suggesting that the pandemic procedures at Fort Dix have exposed him to a specific risk of COVID-19 infection.

The Court is tasked with analyzing the parties' arguments under the factors outlined in *Creek*. The first factor, the severity of the risk that the COVID-19 virus poses to the Defendant, given his existing medical conditions and the current COVID-19 situation at FCI Fort Dix, weighs against the Defendant here. Defendant presents corroborated evidence showing obesity, but any hypertension is undiagnosed. Although obesity is an aggravating factor, that alone is not necessarily enough to weigh in his favor. The current situation at Fort Dix, though initially characterized to favor Bradley, places a thumb on the scale for the Government. Fort Dix is experiencing a significant outbreak, with case numbers more than doubling in the time Defendant's supplemental brief was filed and the writing of this memorandum opinion. However, the outbreak is contained, with most cases being in the West Compound in housing unit 5812, and the remainder within special housing or in quarantine due to a positive test upon transfer.

With respect to the second factor, the Court must balance the risk of COVID-19 infection with the other Bail Reform Act factors, including risk of flight and danger that his release poses to the community. As Defendant has put forth no evidence demonstrating that his circumstances have changed regarding the risk of flight or danger to the community, this factor also favors the

Government's position.[4] *See United States v. Sepling*, 2020 WL 2494670, at *3 (M.D. Pa. May 14, 2020) (quoting *United States v. Rollins*, 2020 WL 1482323, at *2 (W.D.N.Y. Mar. 27, 2020)). Consequently, the Court rejects Defendant's contention that the COVID-19 pandemic constitutes a compelling reason to permit temporary release.

### C. *Effective Preparation of Defense*

For his final argument, Defendant contends that his pretrial release is necessary for the effective preparation of his defense, so as not to offend his Sixth Amendment right to counsel. Dkt. 895 at 9–12. Due to the COVID-19 pandemic, FCI Fort Dix, where Bradley is housed, has recently suspended all visitation indefinitely. Dkt. 901. Even if Fort Dix permits in-person visits in the near future, Defendant still argues that his Sixth Amendment right to counsel is being violated for the following reasons: (1) counsel's office is more than five (5) hours from the prison, (2) counsel faces increased COVID-19 risks by attending visits in person, and (3) because Bradley does not have access to his laptop and because phones are monitored, he cannot actively assist in his defense. He argues that the reasons listed, taken together, are enough to warrant temporary release as a compelling circumstance.

The Court disagrees. As the Government outlines in its brief, these circumstances are not compelling. First, the "issue" of driving distance can be easily resolved if Bradley requests a transfer to a local jail in advance of trial. Dkt. 899 at 20. At no point has he requested such a transfer. And even if Bradley were to be released to Michigan as requested, his attorney will likely be further away from him than he is now, compounding the problem. In addition, Bradley has already prepared for his defense, since the only issue on remand is the venue question, which has already been litigated on multiple occasions and there is no significant time pressure regarding

---

[4] Even if the Court took notice of Bradley's undiagnosed hypertension, the second factor would still counsel against allowing him to be released.

16

preparation because of the pending interlocutory appeal. Bradley's contentions that phone calls are limited and not confidential and the text messaging is "rudimentary" is equally uncompelling. Dkt. 907 at 8. The issues presented by the Defendant are certainly difficult, but he stretches them too far in suggesting that he has no reasonable opportunity to consult with counsel and prepare a defense. *Id.* at 10.

Even with limited phone time, and no in-person visitation at this point, Bradley has not presented any reason why he cannot research, review, or prepare in an adequate manner. Although restrictions to the law-library have increased due to COVID-19, inmates still have access to Lexis-Nexis within the housing units. *Id.* at 9. Simply stating he cannot access his laptop or documents from prison is insufficient. Not only that, but his circumstances are no different from that of any other detained inmate preparing for litigation at Fort Dix. Taken to its logical extreme, Defendant would have the Court release every prisoner at FCI Fort Dix due to the alleged inability to adequately prepare a legal defense. Ultimately, Bradley fails to persuade the Court that his circumstances demand a label of "compelling" and warrant temporary release.

## Conclusion

For these reasons, the Court **DENIES** Defendant's Motion for Revocation of Detention Order. In doing so, the Court affirms Judge Hoppe's order for the reasons stated in this opinion.

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion and the accompanying Order to the parties.

ENTERED this  13th  day of November, 2020.

*[signature: Norman K. Moon]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE